WILMA WELLS MORGAN v. HAROLD M. WELLS, OGLEE
McDOLE, LENORA McDOLE & NATIONAL OLD LINE
INSURANCE COMPANY

4151                                    415 S. W. 2d 323

Opinion delivered May 8, 1967

*Douglas Bradley* and *Penix & Penix,* for appellant.

*W. B. Howard* and *Jack Segars,* for appellees.

CARLETON HARRIS, Chief Justice. Appellant, Wilma
Wells Morgan, was granted a divorce from appellee,
Harold M. Wells, on October 12, 1962.[1] During the mar-
riage, these parties acquired approximately 2½ acres
of land in Craighead County, a half interest in a 120-
acre farm in Greene County, and equity in a residence

[1] Appellant, after her divorce, married Clayton Howard Morgan,
but for convenience, she will be referred to in this opinion as Mrs.
Wells, since most of the testimony deals with matters that occurred
during her marriage to appellee Wells.

in Jonesboro, all of these properties being held as estates by the entirety. However, only the Greene County farm is involved in this appeal. The other half interest in the farm is owned by appellees, Oglee McDole and Lenora McDole, his wife, Lenora being a sister of appellee Wells. In March, 1962, appellee retained an attorney for the purpose of commencing a divorce action against appellant, and such a suit was filed. Mrs. Wells, in the office of her husband's attorney, executed an entry of appearance and the parties entered into a written separa-. ration agreement. However, Wells dismissed his suit, and they resumed the marital relationship. Thereafter, they purchased and made a down payment on the Jonesboro property,[2] mentioned above, and resided thereon until a subsequent separation in September, 1962, when Mrs. Wells instituted suit for divorce. This suit was filed by Mr. John States, Mrs. Wells' attorney. As her attorney, Mr. States prepared a Waiver and Entry of Appearance, for Mr. Wells' signature. As to property, the waiver provides:

"For and in consideration of this waiver it is agreed that the defendant Harold Wells is to pay to the plaintiff Wilma Wells child support in the sum of $80.00 each month and this is in lieu of any other property rights.

"It is agreed that the defendant is to set aside the home located at 1407 Cole Street in the City of Jonesboro as the sole property of the plaintiff herein and that she has agreed to meet monthly payments falling due hereafter. Plaintiff makes no claims against any other real estate other than the home and personal property necessary to maintain the home consisting of household goods located therein as the property of the plaintiff herein."

Wells then took the waiver to his own attorney, Mr. Joe Boone. Boone called States, and inquired particularly as to which party would get the Greene County

---

[2]Prior to the purchase of this property, Mr. and Mrs. Wells had lived on the Greene County farm.

farm, and States advised that his client, Mrs. Wells, was not interested in the farm, and did not want any part of it.[3] Wells then executed the waiver, and thereafter, on October 12, Mrs. Wells was granted a divorce. The decree recites that the divorce was rendered upon the complaint, the Waiver and Entry of Appearance executed by appellee, the oral testimony of appellant, and one Jean Harrison, a witness on her behalf. As to property, the decree recites as follows

"The court further finds that the parties have agreed on their property *** that the dwelling located at 1407 Cole Street in the City of Jonesboro, Arkansas be awarded to the plaintiff and that she assume monthly payments due on said property. With the final payment of the debt due on same the property is to become her property absolutely. Plaintiff is to receive as her own property the household goods located at the dwelling aforesaid."

The decree contained no recitation as to the Greene County property. No quitclaim deed was given to appellee by appellant. The McDoles, who had already commenced farming the property, continued to occupy same, and paid rent to Mr. Wells, based on his interest.

In October, 1963, Wells and the McDoles applied to the National Old Line Insurance Company, the final appellee in this litigation, for a loan. National Old Line applied to the Kansas City Title Insurance Company for title insurance, and this organization was represented by Mr. States. Since a part of the record title was still in Mrs. Wells, there was a requirement that she either convey her interest, or that she join in the note and mortgage. Appellant refused to execute a deed sent to her by States, but did subsequently sign the note and

[3]Boone testified that he specifically asked States if a quitclaim deed to this property would be executed by appellant in favor of appellee, and was informed that would be done. States agreed that he had advised that his client wanted no part of the farm, but said that he did not remember the particular statement about executing the deed.

mortgage, and this, according to her testimony, was done at the request of the McDoles and her ex-husband. The instruments were signed in St. Louis, Missouri.[4] The loan, in the amount of $12,500.00, was closed. A portion of this money was used to pay an outstanding lien to Connecticut General Life Insurance Company, costs of the loan, and the balance, of approximately $4,800.00, was disbursed to appellees. Of this amount, approximately $1,500.00 was used to dig a well on the farm.

Admittedly, Mrs. Wells did not receive any part of the money. The record does not show whether the first annual payment due (December, 1964) to National Old Line was paid, but it does reflect that taxes were paid on the property by appellees Wells and McDole. In other words, it does not appear that appellant has spent any money on the property since the divorce.

In January, 1965, Mrs. Wells instituted suit against all appellees, alleging that she had an interest in the property as a tenant by the entirety; that the parties could not agree upon an equitable division of the lands, and that said lands (the Greene County farm) be partitioned and divided among them, if susceptible of division, and, if not susceptible of division, the property be sold, and the proceeds divided according to the several interests of the parties. National Old Line Insurance Company answered, asserting that, if the property were ordered sold, it should be sold subject to the mortgage lien of the insurance company; the McDoles and Wells filed separate answers and counter-claims which in effect denied that appellant held any interest in the property. After the filing of several amendments to the pleadings by the parties, the cause proceeded to trial. At the conclusion of the evidence, the court entered its decree, finding, as to the realty here involved:

"That the complaint of the plaintiff for the partition of the real property hereinafter described should

---

[4] After her marriage to Morgan, appellant resided with her new husband in Wichita Falls, Texas. However, they separated, and she went to St. Louis, Missouri.

be denied and dismissed for want of equity; *** that the plaintiff is estopped to assert any interest in the real property hereinafter described; that the plaintiff is entitled to no relief as against the defendants McDole; that the plaintiff is entitled to no relief as against the defendant, National Old Line Insurance Company; *** and that plaintiff is not entitled to an accounting for any matter asserted in her pleadings against the defendants, Harold M. Wells, Oglee McDole and Lenora McDole.''

From the decree, appellant brings this appeal.

Only one point is relied upon for reversal, *viz.*, ''It was error for the court to divest appellant of the record title in her lands and to fail to grant her petition and an accounting.'' However, several different grounds are advanced in support of this point.

Appellant argues that fraud was committed upon her, and that she was overreached in executing the written separation agreement in March, 1962; also, that she signed because of fear of her husband. We do not agree that the testimony establishes these facts; to the contrary, we are of the opinion that the evidence preponderates to the effect that Mrs. Wells read the instrument before signing, and fully understood its meaning and effect; further, that she executed same entirely voluntarily and free from any coercion by her husband. However, there is no necessity to discuss the evidence on this point since appellee concedes that the written separation agreement was abrogated by the reconciliation of the parties which occurred subsequent to the execution of the instrument.

Appellant, likewise, advances the argument that the divorce decree of October 12 was *res judicata* as to property rights; that the phrase, ''court further finds that the parties have agreed on their property,'' is compatible only with the conclusion that the parties were leaving all record titles as they then existed. We do not

agree with this argument. In *Smith* v. *Smith,* 190 Ark. 418, 79 S. W. 2d 265, the same contention was urged. Though the facts were somewhat different, the point here raised by appellant was mentioned. We said:

"Appellant also contends that the decree of foreclosure should be reversed, because the property settlement was not incorporated in the decree for absolute divorce, or because it was not adopted in rendering the final divorce decree, and that their property rights now must be treated in this case as adjudged in the divorce suit. It was not necessary for the property rights of the parties to be adjudged in the divorce proceeding, as they had been settled by contract. The parties had a right to settle their property rights out of court by contract, and their contract relative thereto might be thereafter enforced in a court of competent jurisdiction."

Likewise, in *Fisher* v. *Fisher,* 237 Ark. 321, 372 S. W. 2d 612, a property settlement was effected between the parties preceding their divorce. This court stated the facts, as follows:

"The principal issue presented in this case is whether the appellee should have a reformation of the deed she received from the appellant. This deed was part of a property settlement between them preceding their divorce. Following the divorce appellant instituted this suit alleging that he and the appellee owned twenty-six acres as tenants by the entirety. He asked for partition thereof and for his proper share of the rents collected by the appellee. In her answer appellee denied his assertions. By cross-complaint she contends that she is the sole owner of the disputed property by the terms of their property agreement and that this tract of land was omitted through mutual mistake or fraud from appellant's deed to her, therefore, the deed should be reformed to include this land. The appellant denied the allegations in the cross-complaint and then pleaded as a de-

fense the statute of frauds and *res judicata*. Upon a trial of the issues the Chancellor decreed reformation of the deed so as to convey to appellee the disputed lands. From that decree appellant brings this appeal.''

Mrs. Fisher testified that she did not know the twenty-six acres had been omitted from the deed, but Mr. Fisher testified that he observed that the twenty-six acres were not included, and, if this acreage had been included, he would not have signed the instrument. After disposing of other arguments, this court, as to *res judicata*, said:

''In the case at bar the divorce decree specifically recites: 'There are no property rights to be determined herein.' The appellant and the appellee are in agreement that there was a property settlement between them before the divorce. They disagree only as to the inclusion of the twenty-six acres. The daughter and son-in-law corroborated the appellee's version of this agreement which was perfected before the granting of the divorce as is indicated by the very terms of the decree. It cannot be said that upon the face of the record or by extrinsic evidence the property rights between appellant and appellee were raised and determined in the divorce action.''

In the instant case, the wording of the divorce decree is somewhat stronger, since it specifically finds that ''the parties have agreed on their property.'' Likewise, they are in agreement that there was a property settlement between them—but, as in *Fisher*, they simply disagree as to the provisions of the settlement. Here, too, appellees' version is corroborated by other witnesses, while appellant furnished no corroboration for her version of the settlement. Mr. States, who *represented appellant*, testified that the parties entered into their oral agreement in his office, and in his presence. From his testimony:

''Well, the first thing discussed between the two of them in my presence was support money for the chil-

dren. That was the first thing I directed their attention to because I was interested in seeing how the children were going to be cared for under the decree and then a discussion was had in regard to two automobiles. She kept the automobile she was driving and he kept the automobile he was driving. Then she wanted the household goods in the house there on Cole Street and he agreed to that. Then she wanted the dwelling on Cole Street to be hers and said that she would make the monthly payments and then, as I recall, Harold mentioned something about a farm in Greene County and Mrs. Wells said, 'I'm not interested in the farm. I don't want any part of it.' When they got to that point then, I thought that was all the property they had. Nothing else had been discussed. I turned then to Mrs. Wells and I said, 'Now, I'm going to draw up an Entry of Appearance and I want to be sure that you understand. You get the property on Cole Street and you make the monthly payments,' and she said, 'That's right,' and, 'You're not interested in the farm property?' and she said, 'That's right.' Then I left them and went in to my typewriter in the small room and drafted the Entry of Appearance.''

Appellant strenuously objected to this testimony, contending that it was a privileged communication between attorney and client, and that States could only testify to the aforementioned facts, after first obtaining the consent of appellant. The trial court overruled the objection—and, we hold, properly so. The reason is stated in the case of *Vittitow* v. *Burnett*, 112 Ark. 277, 165 S. W. 625:

''The object of the rule is to secure freedom in communication between attorney and client in order that the former may act with full understanding of the matters in which he is employed; but, as the rule tends to prevent a full disclosure of the truth, it should be strictly construed and limited to cases falling within the principle on which it is based. 40 Cyc. 2361, 2362. There is no privilege as to statements by a client to

his attorney for communication to a third person. 40 Cyc. 2375. Vittitow employed Carpenter to assist him in purchasing the land from Burnett; and directed him to write to Burnett, making him an offer for the land. It was intended that the matters embraced in the letter written by Carpenter to Burnett should be communicated to the latter, and it was necessary that it should be communicated to Burnett in order to be acted upon. Therefore, the letter falls within the rule that communications made to an attorney by a client and intended by the latter to be imparted to a third party for the benefit of the client do not come within the rule laid down in the statute."

Here, according to two witnesses (States and appellee), the discussion as to settlement was not simply between States and Mrs. Wells, but also included Mr. Wells. Of course, since no settlement could be entered into without each party knowing what the other party required in settlement, it was absolutely necessary, even though they had not been in the same room together, that the views of each be communicated to the other. No privilege attached in this case.

We think the wording of the Waiver and Entry of Appearance establishes that a property settlement was entered into, and we likewise are of the opinion that the great weight of the evidence shows that the provisions of that settlement were in accord with the testimony of appellee Wells and his witnesses. While the written settlement, prepared by attorney Joe Boone of Jonesboro, and entered into in contemplation of the first divorce action, was abrogated, and of no legal effect in this controversy, it is interesting to note that the disposition of the Greene County property was exactly the same as in the alleged oral agreement, i. e., Mr. Wells was to have the Greene County Farm. Appellant argues that the meaning of the clause in the waiver providing that Mrs. Wells "makes no claims against any other real estate other than the home and personal property," is simply that she makes no claim to any

property *belonging to her husband,* and that the quoted language has no reference to property which the two of them own together as an estate by the entirety.

This brings us to the question of estoppel which we consider to be applicable and controlling in this litigation. Mrs. Wells certainly did not apply the above reasoning to the property held as an estate by the entirety which she was to receive, for she did take exclusive possession of the home on Cole Street in Jonesboro. The fact that she later lost this property because of failure to meet payments is not material herein. Having acted upon the provisions of the agreement which were to her advantage, she cannot subsequently be heard to reject those portions of the same agreement which were not to her advantage. Appellant asserts that appellee is also estopped to question her title to the farm property because of the fact that she executed the note and mortgage to National Old Line Insurance Company, and this act inured to the benefit of appellee in that the company would not have loaned the money, except for the fact that she likewise became liable on the note. We do not agree with this argument. It is true that Mrs. Wells executed these instruments; it also appears from her testimony that she was requested to sign same by the McDoles and her ex-husband. Let it first be remembered that this request would never have been made if she had conveyed her interest in the farm, as we find she had agreed to do. In the next place, irrespective of how many times she might have been asked to execute the instruments, it is very clear from the testimony that she was not caused to execute same by virtue of any representations made by appellee Wells. Of course, unless she relied upon his statements, there can be no valid claim of estoppel. *Storey* v. *Brewer,* 232 Ark. 552, 339 S. W. 2d 112. That she placed no reliance whatsoever on anything her ex-husband might have said is abundantly clear. From her testimony, during cross-examination:

"Q. You have told us that you had a very close relationship with the McDoles, is that right?

A. Yes, sir.

Q. Well, just how would you characterize your relationship with Harold Wells at the time this conversation took place?

A. Just mutual.

Q. Just what?

A. Just mutual I guess you'd call it.

Q. Mutual, just what do you mean by that?

A. I don't know how to express it.

Q. Just tell us, what was your relationship with Harold. Was it pleasant or unpleasant?

A. It was unpleasant most of the time.

Q. Unpleasant most of the time, so you sure wouldn't believe anything Harold told you about it, would you?

A. No, sir.

Q. You didn't have any reason to trust Harold, did you?

A. No, sir.

Q. You knew he would skin you out of your eyeteeth if he got a chance, didn't you?

A. Yes, sir."

If Mrs. Wells signed these instruments because of the urging of any of the parties, it would appear such action was influenced by her relationship with the McDoles, rather than because of any representations on

the part of her ex-husband. She testified that she had a very close relationship with this couple, had visited them on several occasions, and that she and her present husband had even spent the night with them. The record also reflects correspondence with the McDoles.

The testimony in this case was very much in conflict, but we agree that the weight of the evidence supports the findings of the court. It follows that the principles of law here enunciated are controlling.

Affirmed.